IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEPHEW MINI MARKET, LLC, *et al.*,

    *Plaintiffs*,

    v.

UNITED STATES OF AMERICA,

    *Defendant*.

Civil Action No. ELH-21-2318

**MEMORANDUM OPINION**

This case arises under the Supplemental Nutrition Assistance Program ("SNAP" or the "Program"). It concerns the penalty of permanent disqualification imposed on plaintiff Nephew Mini Market, LLC ("Mini Market" or the "Store"), a SNAP retailer, because of two "trafficking" violations.

SNAP was established pursuant to the Food Stamp Act of 1964, as amended, 7 U.S.C. § 2011 *et seq.* (the "Act"). It is administered by the Food and Nutrition Service ("FNS" or the "Agency"), which is part of the U.S. Department of Agriculture ("USDA"). *See* 7 C.F.R. § 271.3.[1] FNS determined that the Store engaged in the trafficking of SNAP benefits when Nadeem Asghar, the owner of the Store, exchanged benefits for cash on two occasions in one day. *See* ECF 17-2 at 89-107. Although plaintiffs sought a civil money penalty ("CMP"), FNS determined to permanently disqualify the Store from participation in the Program. *See* 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6; *see also* ECF 17-2 at 192-94 (Determination Letter). Plaintiffs sought administrative review of that decision. ECF 17-2 at 197-98. However, in a Final Agency

---

[1] The Program was originally referred to as the "Food Stamp Program." *See* the Food Stamp Act of 1964, H.R. 10222, 88th Cong. § 3(k) (1964). In 2008, Congress replaced the "Food Stamp Program" with the "Supplemental Nutrition Assistance Program." *See* Food, Conservation, and Energy Act of 2008, H.R. 6124, 110th Cong. § 4001 (2008).

Decision ("FAD") issued on January 29, 2021, the Agency upheld the disqualification. *See id.* at 201.

Thereafter, Mini Market and Asghar filed suit against the United States (the "Government") in the Circuit Court for Baltimore City, seeking judicial review of the FAD. ECF 4 (the "Complaint"); ECF 1-5 (same).  Specifically, plaintiffs challenged whether "a trafficking offense occurred" as well as the appropriateness of the "penalty issued by the USDA" regarding the Store's "eligibility for and amount of any CMP."  ECF 4, ¶¶ 14-16.  The Complaint was accompanied by five exhibits.  ECF 1-6 through ECF 1-10.

The Government removed the case to this Court, pursuant to 28 U.S.C. §§ 1441, 1442, and 1446.  ECF 1 (the "Notice"). Thereafter, defendant moved to dismiss the Complaint for lack of subject matter jurisdiction, under Fed. R. Civ. P. 12(b)(1), and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment.  ECF 15.  The motion is supported by a memorandum.  ECF 15-1 (collectively with ECF 15, the "Motion"). The Government has submitted a copy of "the administrative appeal record."  *See* ECF 17-2 (the "Record"); *see also* ECF 17-1 (Declaration of Vicky Robinson, Chief, Administrative Review Branch).[2]

Plaintiffs oppose the Motion (ECF 20), supported by a memorandum.  ECF 20-1 (collectively, the "Opposition"), and one exhibit.  ECF 20-2.  And, the Government has replied (ECF 25, the "Reply"), accompanied by two exhibits.  ECF 25-1; ECF 25-2.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall dismiss the suit for lack of subject matter jurisdiction. To the extent the Court

---

[2] The Record is labeled "Redacted Administrative Record."

has jurisdiction, however, I shall construe the Motion as one for summary judgment and I shall grant it.

## I. Factual Background

### A. SNAP

SNAP was enacted "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. To achieve that mission, SNAP provides qualifying individuals and families with supplemental funds to purchase eligible items from approved retailers. *Id.* §§ 2013, 2018; 7 C.F.R. § 278.1.

Beneficiaries of SNAP are provided with benefits by way of an Electronic Benefits Transfer ("EBT") card. *See* 7 U.S.C. § 2016(j)(1)(A). The EBT card operates like a debit card. But, it may only be used to buy designated food items from authorized SNAP retailers. *Id.* § 2013(a); *see also* 7 C.F.R. § 271.2 (defining "eligible foods" as, in pertinent part, "[a]ny food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption"); 7 U.S.C. § 2018 ("Approval of Retail Food Stores and Wholesale Food Concerns"); 7 C.F.R. § 278.1 (same).

Notably, "trafficking" in SNAP benefits is prohibited. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). "Trafficking" is defined, in pertinent part, as "buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed" via EBT cards "for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. § 271.2.

Periodically, FNS reviews authorized retailers and may disqualify an approved retail store that violates the Act or its implementing regulations.  In particular, 7 U.S.C. § 2021(a) provides (bold in original):

**(a) Disqualification**

    **(1) In general**

An approved retail food store or wholesale food concern that violates a provision of this chapter or a regulation under this chapter may be –

    (A) disqualified for a specified period of time from further participation in the supplemental nutrition assistance program;

    (B) assessed a civil penalty of up to $100,000 for each violation; or

    (C) both.

    **(2) Regulations**

Regulations promulgated under this chapter shall provide criteria for the finding of a violation of, the suspension or disqualification of and the assessment of a civil penalty against a retail food store or wholesale food concern on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system.

SNAP regulations require FNS to consider three factors in making a disqualification or penalty determination: "(1) The nature and scope of the violations committed by personnel of the firm, (2) Any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and (3) Any other evidence that shows the firm's intent to violate the regulations." 7 C.F.R. § 278.6(d).  However, when it comes to trafficking, the Agency's discretion, and its consideration of these factors, is sharply circumscribed.

Originally, the Food Stamp Act of 1964 left the issue of disqualification for trafficking violations to the discretion of the Secretary of USDA (the "Secretary").  *See Corder v. United*

4

*States*, 107 F.3d 595 (8th Cir. 1997) (discussing statutory history of Food Stamp Program); *Ghattas v. United States*, 40 F.3d 281, 283-84 (8th Cir. 1994) (same); *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999) (same).  From 1982 to 1988 the Act precluded the exercise of any discretion and mandated permanent disqualification for trafficking violations. *See Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997).  In 1988 Congress amended the statute, conferring discretion on the Secretary to impose a monetary penalty in lieu of permanent disqualification, but only under certain circumstances.  *See* Hunger Prevention Act of 1988, S. 2560, 100th Cong. § 344, 102 Stat. 1645, 1664 (1988); *Ahmed*, 47 F. Supp. 2d at 391.[3]

Section 2021(b)(3)(B) of 7 U.S.C. provides:

[D]isqualification . . . shall be . . . (3) permanent upon . . . (B) the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons . . . except that the Secretary shall have the discretion to impose a civil penalty of up to $20,000 for each violation . . . in lieu of disqualification under this subparagraph, . . . if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations, including evidence that—

(i) the ownership of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; and

(ii)(I)  the management of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; or

(II)  the management was aware of, approved of, benefited from, or was involved in the conduct of no more than 1 previous violation by the store or food concern[.]

---

[3] The Secretary's functions have been delegated to FNS.  *See* 7 C.F.R. § 271.3.

The legislative history pertinent to § 2021(b) addressed the reasons for the inclusion of the civil money penalty as a possible sanction.  H.R. Rep. No. 100-828, pt. 1, at 27–28 (1988) states (emphasis added):

> *The permanent disqualification of retail food stores upon the first trafficking offense—without any evaluation of preventive measures taken or complicity in the trafficking—seems excessively harsh.*  The Committee substitute gives the Secretary of Agriculture the discretion to impose a fine of up to $20,000 on a retail or wholesale food store instead of disqualification.  The Secretary may exercise that discretion—if it is determined that there is substantial evidence that the store had an effective policy and program to prevent these violations of the Food Stamp Act.
>
> Examples of an effective policy and program to prevent violations of the Act or regulations by a store or concern might include the following: (i) effective written policies and procedures to be followed by store personnel that are consistently applied by management; (ii) initial training of store managers and employees in the proper handling of food stamps; (iii) periodic oversight and continuing education of store personnel in the proper handling of food stamps; and (iv) other reasonable and good faith efforts that demonstrate the existence of an effective policy and program by the store or concern to prevent violations of the act or regulations.
>
> A retail food store or wholesale food concern which has an effective policy and program to prevent trafficking should not be presumptively disqualified from participation in the Food Stamp Program due to the unauthorized or expressly prohibited acts of store personnel . . . .
>
> However, innocent persons should not be subject to the harsh penalty of disqualification where a store or concern has undertaken and implemented an effective program and policy to prevent violations.  The Secretary of Agriculture is directed to promulgate regulations consistent with the described amendment . . . .
>
> This provision provides [the Secretary with discretion].  The Act will retain strict penalties—fines can be imposed as well as disqualification from participation in the food stamp program.  With Secretarial discretion, we can be assured that the punishment will more closely fit the crime.

The regulations implementing the Program are also pertinent.  As a general matter, the SNAP regulations provide that FNS may elect to send a warning letter "if violations are too limited to warrant a disqualification."  7 C.F.R. § 287.6(e)(7).  Nevertheless, such an option does

not apply in the context of trafficking. *See* 7 U.S.C. § 2023(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy.").

The SNAP regulations provide that FNS "shall . . . [d]isqualify a firm permanently if: (i) Personnel of the firm have trafficked as defined in [7 C.F.R.] § 271.2 . . . ." 7 C.F.R. § 278.6(e)(1)(i). A disqualification "shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, [or] evidence obtained through a transaction report under an electronic benefit transfer system . . . ." 7 C.F.R. § 278.6(a); *see* 7 U.S.C. § 2021(a)(2); *AJS Petroleum, Inc. v. United States*, L-11-1085, 2012 WL 683538, at *1 (D. Md. Mar. 1, 2011). But, of relevance here, even if an authorized retailer is found to have trafficked in benefits, disqualification is not the only sanction. In lieu of permanent disqualification, the FNS may impose a civil money penalty, so long as it acts "in accordance with the provisions of § 278.6(i) and § 278.6(j)." 7 C.F.R. § 278.6(a).

To qualify for a CMP, however, the retailer must request this alternative penalty within ten days of receipt of the charge letter from FNS. *See* 7 C.F.R. § 278.6(b)(2)(iii). In addition, the retailer must submit "substantial evidence" showing that the retailer meets multiple criteria. *See Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004).

The regulatory criteria are as follows, 7 C.F.R. § 278.6(i):

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3.  The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4.  Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm.

"All four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP]."  *Castillo*, 989 F. Supp. at 418.  Moreover, 7 C.F.R. § 278.6(i) provides additional detail as to Criterion 1 and Criterion 3.  Regarding Criterion 1, 7 C.F.R. § 278.6(i)(1) states:

(1) Compliance policy standards.  As specified in Criterion 1 above, in determining whether a firm has established an effective policy to prevent violations, FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with this part 278 of current FSP regulations and current FSP policy on the proper acceptance and handling of food coupons.  As required by Criterion 2, such policy statements shall be considered only if documentation is supplied which establishes that the policy statements were provided to the violating employee(s) prior to the commission of the violation.  In addition, in evaluating the effectiveness of the firm's policy and program to ensure FSP compliance and to prevent FSP violations, FNS may consider the following:

(i)      Documentation reflecting the development and/or operation of a policy to  terminate the employment of any firm employee found violating FSP regulations;

(ii)     Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of FSP violations or irregularities committed by firm personnel;

(iii)    Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with FSP regulations;

(iv)    The nature and scope of the violations charged against the firm;

(v)     Any record of previous firm violations under the same ownership; and

8

      (vi)     Any other information the firm may present to FNS for consideration.

As for Criterion 3, 7 C.F.R. § 278.6(i)(2) provides:

(2) Compliance training program standards. As prescribed in Criterion 3 above, the firm shall have developed and implemented an effective training program for all managers and employees on the acceptance and handling of food coupons in accordance with this part 278. A firm which seeks a civil money penalty in lieu of a permanent disqualification shall document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s). FNS shall consider a training program effective if it meets or is otherwise equivalent to the following standards:

      (i)  Training for all managers and employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed shall be conducted within one month of the institution of the compliance policy under Criterion 1 above. Employees hired subsequent to the institution of the compliance policy shall be trained within one month of employment. All employees shall be trained periodically thereafter;

      (ii) Training shall be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278;

      (iii) Written materials, which may include FNS publications and program regulations that are available to all authorized firms, are used in the training program. Training materials shall clearly state that the following acts are prohibited and are in violation of the Food and Nutrition Act of 2008 and regulations: the exchange of food coupons, ATP cards or other program access devices for cash; and, in exchange for coupons, the sale of firearms, ammunition, explosives or controlled substances, as the term is defined in section 802 of title 21, United States Code.

The SNAP regulations also contemplate a "hardship waiver," under which "FNS may impose a civil money penalty as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to SNAP households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices."

7 C.F.R. § 278.6(f).   However, such a CMP "may not be imposed in lieu of a permanent disqualification." *Id.*

Of relevance here, the regulations provide for administrative and judicial review of a decision by FNS to disqualify a SNAP retailer.  *See* 7 U.S.C. § 2023(a); 7 C.F.R. § 279.  First, FNS must provide the retailer with written notice of its initial decision.  7 U.S.C. § 2023(a)(1).  Within ten days of receipt of the notice, the retailer may ask FNS to review the decision.  *Id.* § 2023(a)(3); 7 C.F.R. § 279.1.  FNS must then review its initial decision and render a Final Agency Decision, which takes effect thirty days after notice of the decision has been delivered to the retailer.  7 C.F.R. § 279.5.  Upon receipt of a Final Agency Decision, a retailer may seek judicial review.  7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

### B.  Factual Summary[4]

The Store is a limited liability corporation that operates a retail convenience store located on McElderry Street in Baltimore City.  *See* ECF 4, at 2 ⁋ 1; ECF 17-2 at 1.  The Store opened for business on June 1, 2015.  ECF 17-2 at 25.  It is owned by Nadeem Asghar.  *See* ECF 4 at 2, ⁋ 2; ECF 17-2 at 6.

Photographs taken of the Store as part of a SNAP site visit on June 26, 2015, indicate a typical urban convenience store selling an array of products.  ECF 17-2 at 43-56; *see id.* at 40 (stating date on which review was completed); *see also id.* at 61-88 (photographs of Store taken during review on December 23, 2019).  FNS data reflects that the Store generated $598,741 in "Actual Retail Sales" for tax year 2018.  *Id.* at 12.

---

[4] The facts are drawn from the Record (ECF 17-2).  Throughout the Memorandum Opinion, I cite to the electronic pagination, which does not always align with the page numbers cited in the parties' submissions.

Mini Market applied for SNAP authorization in June 2015.  ECF 17-2 at 25-29 (the "Application"); *see id.* at 1 (indicating that the Agency received the Store's application on June 3, 2015).  The Application was authorized on July 7, 2015.  *Id.* at 4.

The Application included a certification "confirming [plaintiffs'] understanding of and agreement with," *inter alia*, the following, *id.* at 29:

- I will receive Supplemental Nutrition Assistance Program training materials upon authorization.  It is my responsibility to ensure that the training materials are reviewed by all firm's owners and all employees . . . and that all employees will follow Supplemental Nutrition Assistance Program regulations. . . . .

- I am aware that violations of program rules can result in administrative action such as fines, sanctions, withdrawal, or disqualification from the Supplemental Nutrition Assistance Program . . . .

- I accept responsibility on behalf of the firm for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time. These include violations such as, but not limited to: . . . Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking) . . . .

The Record does not reflect any interactions of significance between plaintiffs and the Agency until March 2020.  *See id.* at 2-4.  On March 2, 2020, the FNS opened a case pertaining to the Store.  *Id.* at 31.[5]  An undercover investigator visited the Store a total of five times between June 16, 2020 and June 19, 2020.  The investigator's findings were memorialized in a "Report of Positive Investigation," dated July 1, 2020.  *Id.* at 89-102 (the "ROPI" or "Report").[6]

According to the Report, the investigator first visited the Store on June 16, 2020.  At that time, a Store employee named Zain Tariq was working as the Store's clerk.  *Id.* at 131.  "The

---

[5] The Government asserts, without specificity, that FNS initiated the review "due to data abnormalities that warranted further inspection."  ECF 15-1 at 11.  Plaintiffs do not appear to contest the assertion.

[6] The name of the investigator was redacted from the Record.  *See* ECF 17-2 at 89.  For the sake of simplicity, I shall sometimes refer to the investigator using male pronouns.

investigator  placed all items on the counter, and presented the EBT card to the store clerk for purchase." ECF 17-2 at 90.  The investigator's EBT card had a SNAP balance of $837.35.  *Id.* Then, "[t]he clerk removed the non-food items from the counter and said that the items could not be purchased using SNAP benefits."  *Id.*  The investigator "asked the clerk to utilize the EBT card for non-food items[,]" but "the clerk refused."  *Id.*  "The clerk then completed the transaction for the food items only," and "deducted $9.50 for items purchased from the investigative EBT account."  *Id.* (underlining in original).

On June 18, 2020, the investigator returned to the Store and purchased food items.  *Id.* at 92.  On that date, Asghar was working as the Store clerk.  *Id.* at 131.  Specifically, the investigator wrote, *id.* at 92 (underlining in original): "As the clerk rang up the items, my issued [EBT] card was where it could be viewed by the clerk.  I gave the clerk the EBT card, which had a total of $753.52 in [SNAP] benefits.  The clerk deducted $19.50 for items purchased from the investigative EBT account."

And, on the following day, June 19, 2020, the investigator returned to the Store on three occasions.  Asghar was again working as the Store clerk during each of the investigator's visits.  *Id.* at 131.  According to the ROPI, the investigator "entered the subject store, placed all items on the counter, and presented the EBT card to the clerk for purchase."  *Id.* at 94.[7]  However, the "clerk removed the non-food items and stated that they could not be purchased using SNAP benefits."  *Id.*  The investigator then "asked the clerk to utilize the EBT card for the non-food items," but "the clerk refused."  *Id.*  Asghar then "completed the transaction for food items only."

At that juncture, the investigator "spoke with the clerk about purchasing various items for the store with [his] food stamps in exchange for cash."  *Id.* Asghar responded by asking if the

---

[7] The investigator did not specify the time at which he first visited the Store on June 19, 2020.

investigator "steal[s] the items." ECF 17-2 at 94.  The investigator replied, *id*.: "'No, I buy them from [redacted] with my EBT card.'"  *Id.*  Ashgar then asked the investigator to buy "(1) 24-16 oz case of Monster Energy drink and as much Ensure Nutrition shake with [his] food stamps as [he] could . . . ."  *Id.*  Asghar also said that he would pay the investigator upon his return.  *Id.*  The investigator agreed and told Asghar that he "would go to [redacted] right now to purchase the Monster and Ensure."  *Id.*

Thereafter, at approximately 11:52 a.m. on June 19, 2020, the investigator purchased the "(1) 24-16oz case of Monster Energy drink and (4) 24-8 oz cases of Ensure nutrition shake that [he] purchased . . . with [his] food stamps as requested by the clerk."  *Id.* at 96.  Upon the investigator's return to the Store at an unspecified time thereafter, "the clerk told [him] to put the cases on the floor."  *Id.*   And, the investigator "told the clerk that [he] paid $132.95 in food stamps for the Monster Energy drink and the Ensure nutrition shake that he requested."  *Id.*  The clerk again asked "if [the investigator] stole the product."  *Id.*  The investigator responded, *id.*: "No, I told you I got it from [redacted] with my food stamps."  *Id.*  The investigator attempted to present the receipt to the clerk, but Asghar "refused to acknowledge" the receipt, stating: "'No, I don't need to see it[.]'"  *Id.*  Asghar then handed the investigator $20.00 from the register and asked the investigator to "bring Red Bull today."  *Id.*  The investigator agreed.  *Id.*

At about 12:54 p.m. on June 19, 2020, the investigator purchased six "24-8 oz cases of Red Bull Energy drink" from another store, "using $209.94 in food stamps from [his] EBT card as directed by the clerk."  *Id.* at 98.  The investigator subsequently returned to the Mini Market, after which "[t]he clerk told [the investigator] to put the cases of Red Bull on the counter."  *Id.*  Asghar then asked the investigator, *id.*: "'[Y]ou sure you didn't steal this?'"  *Id.*  The investigator

attempted to show the receipt to the clerk.  ECF 17-2 at 98.  The investigator also said, *id.*: "'I told you how I get it, why would you think I'm stealing it?'"

According to the ROPI, Asghar "refused to acknowledge the receipt . . . ."  *Id.*  Moreover, the clerk said, *id.*: "'[N]o, I believe you man, I saw your balance and you have a lot of money on there,' and then handed [the investigator] $60.00 cash (3-$20.00)" from the register.  *Id.*  And, Asghar then told the investigator "to bring more Red Bull" the following day.  *Id.*  The investigator agreed to do so.  *Id.*

Based on the findings set forth in the Report, Fredrick Conn, the Section Chief of the FNS Retailer Operations Division, issued a "Charge Letter" to Asghar on August 12, 2020.  *Id.* at 113-15 (Charge Letter).  The Charge Letter included a copy of the investigator's ROPI, which recounted the events set forth above.  *See id.* at 116-26.  Further, the Charge Letter informed Asghar that the Report "contains evidence that violations of the Supplemental Nutrition Assistance Program (SNAP) regulations have occurred in your firm," namely "trafficking," for which the sanction is permanent disqualification.  *Id.* at 113.

The Charge Letter advised Asghar that he could provide "any information, explanation, or evidence . . . regarding these charges" within ten calendar days, and that a final decision would be made soon thereafter.  *Id.* at 114.  In addition, the Charge Letter explained that, "under certain conditions, FNS may impose a civil money penalty (CMP) of up to $59,000 in lieu of permanent disqualification of a firm for trafficking."  *Id.* at 113.  Further, Asghar was informed that in order to receive a CMP, the Store would have to meet each of the four criteria listed in 7 C.F.R. § 287.6(i), and "provide the documentation as specified," due within ten calendar days.  *Id.*  And, the Charge Letter indicated that if Mini Market qualified for a CMP, the amount of the penalty would be $38,340.00.  *Id.*

Through counsel, plaintiffs timely contested the Charge Letter, via a letter of August 22, 2020.  ECF 17-2 at 130-33 (the "Response").[8]  The Response was accompanied by SNAP "Retailer Training Materials."  *Id.* at 136; *see id.* at 137-88 ("Training Materials").

At the outset, plaintiffs noted that the Store had participated in the Program since 2015, and, in that time, there had "not been any . . . actions taken by FNS to warn Respondents about" possible violations.  ECF 17-2 at 131.  Further, plaintiffs observed that there had not been any prior "charges brought against Respondents for any SNAP violations."  *Id.*

Moreover, plaintiffs pointed out that when the investigator first visited the Store on June 16, 2019, and asked Tariq, the Store clerk, "to charge his [EBT] card for both food and non-food items," the clerk "refused to do so and completed the transaction for the food items only."  *Id.* However, when the investigator returned to the Store on June 18, 2020 and June 19, 2020, he "encountered a different clerk, Mr. Asghar."  *Id.*  As mentioned, Mr. Asghar is the owner of the Store.  *Id.* at 6.

In the Response, plaintiffs claimed that "[t]he investigator did not include all relevant information in his or her report" with respect to the investigator's interactions with Asghar.  *Id.* at 131.  For instance, plaintiffs explained that "Mr. Asghar's primary language is not English and he has severe difficulties in communicating with native English speakers."  *Id.*  Thus, they maintained that Asghar was "confused by the conversation with the investigator and did not fully appreciate what he was doing."  *Id.*

Further, plaintiffs argued that "this language barrier was compounded by the investigator's statements to Mr. Asghar."  *Id.*  Specifically, the Response stated that the "investigator repeatedly pleaded with Mr. Asghar to provide the investigator with money,

---

[8] The Response refers to Asghar and the Store collectively as the "Respondents."  ECF 17-2 at 130.

representing that the investigator had children to feed and that the investigator's need for money was heightened due to the ongoing COVID-19 pandemic." ECF 17-2 at 131. Plaintiffs maintained that Asghar's actions should be understood as "an effort help someone that he understood to be in a desperate and needy position." *Id.*

And, the Response stated: "Mr. Asghar did not specifically request that the investigator purchase either the Monster energy drinks or the Ensure nutrition shakes." *Id.* Rather, according to the Response, Asghar only made a specific request after being supplied with the other drinks by the investigator. *Id.* at 131-32.

Critically, the Response indicated that Asghar "admits that he did request the Red Bull and did so in violation of SNAP regulations." *Id.* at 132. Nevertheless, plaintiffs maintained that, in light of the totality of the circumstances, "no punishments should be levied against Respondents." *Id.* But, plaintiffs stated that, in the event that punishment was determined to be appropriate, FNS should decline to disqualify the Store from participation in SNAP and instead impose a CMP. *Id.* at 132-34. In support of this contention, the Response stated that the Store had satisfied each of the four criteria enumerated in 7 C.F.R. § 278.6(j).

Regarding Criterion 1 (effective compliance policy) and Criterion 2 (compliance policy and program in effect prior to the violation), the Response posited that the Store had an "effective compliance policy at the time of the alleged violations, as evidenced by the fact that [Store officials] twice refused to violate SNAP when invited to [do so] by the investigator." *Id.* at 133. Further, plaintiffs maintained: "This policy was based on Respondents' knowledge of the SNAP program and information they received from FNS when they first entered the program." *Id.*

Concerning Criterion 3 (effective personnel training program), the Response indicated that Store employees were "trained in this policy effectively, again as evidenced by Mr. Tariq's refusal to violate SNAP regulations when invited to [do so] by the investigator and by Respondents' clean record for five years before this incident."  ECF 17-2 at 133.  Further, the Response highlighted that Store personnel were trained "by Mr. Asghar personally based on his experience and in accordance with the SNAP training guide."  *Id.*  And, with respect to Criterion 4 (no knowledge or involvement by firm ownership), the Response indicated that although Asghar was "aware of and directly involved in the alleged violations at issue here, this was the first such violation for Respondents."  *Id.*

The Response also maintained that the amount of the CMP specified in the Charge Letter, $38,340.00, was detached from the underlying offense.  *Id.* at 133-34.  In support, the Response noted that under 7 C.F.R. § 278.6(j),  the amount of a CMP is calculated by multiplying the "average monthly redemption figure by ten percent" and then "doubl[ing] the product obtained . . . when, as here, 'the fact value of coupons, ATP cards or other benefit instruments involved in the largest single trafficking transaction was $100 or more.'"  *Id.* at 133 (citation omitted). Plaintiffs asserted that based on "average monthly SNAP redemptions" in the amount of approximately $9,125.00, the resulting CMP should total $1,825.00.  *Id.*  Thus, plaintiffs asserted: "The extraordinary fine of $38,340.00 . . . is arbitrary and capricious, as applied to them, a small business . . . operating in a neighborhood in need of businesses accepting SNAP benefits."  *Id.* at 134.

FNS analyzed the information submitted to it by plaintiffs in an internal "Retailer Reply and Case Sanction Recommendation."   *Id.* at 189-191 (the "Recommendation").   After recounting the relevant factual background, the Recommendation concluded that Asghar

admitted that "violations occurred," and thus "a sanction is required."  ECF 17-2 at 190.  Further, after analyzing the four criteria set forth above, the FNS determined that the Store was ineligible for a CMP.  *Id.* at 190-91.

Regarding Criterion 1, the Recommendation found that plaintiffs had not offered sufficient evidence showing that the Store had an effective compliance policy.  *Id.* at 191.  Specifically, the FNS highlighted that although Store personnel twice refused to violate SNAP regulations, "[t]he refusals [were] followed by two trafficking violations."  *Id.*  And, the Recommendation found that no other "information ha[d] been provided to support the store satisfying this requirement."  *Id.*  Because plaintiffs failed to satisfy Criterion 1, the FNS determined that plaintiffs necessarily failed to satisfy Criterion 2.  *Id.*

As to Criterion 3, the Recommendation stated that "no information provided confirms" that an effective personnel training program was "developed and instituted," as the Response failed to include any documentation to confirm that Store personnel had received training.  *Id.*  Further, the Recommendation determined that Criterion 4 was not satisfied, as Asghar was the owner of the Store and thus "he did benefit and was aware" of the trafficking violation.  *Id.*

The Agency's determination was conveyed in a letter authored by Mr. Conn to plaintiffs' counsel on October 5, 2020.  *Id.* at 192-94.  (the "Determination Letter").  It explained that violations had occurred and that the Store was not eligible for a CMP.  *Id.* at 192.  The FNS stated, *id.*: "Consideration has been given to the information available to us relating to our letter of charges dated August 12, 2020, and to your reply of August 22, 2020.  We find that the violations cited in our charge letter occurred at your firm."  The Determination Letter continued, *id.*: "We considered your eligibility for a trafficking civil money penalty (CMP) . . . .  We have determined that you are not eligible for the CMP because you failed to submit sufficient

evidence to demonstrate that your firm had established and implemented an effective compliance policy and program to prevent violations of [SNAP]."

In addition, the Determination Letter advised plaintiffs that, within ten days, the Store had the right to seek review of the Agency's decision by the FNS Administrative Review Branch. *Id.* at 193. The Agency also stated: "[A] careful review of the program file revealed that the illegal acceptance of SNAP benefits outlined in our letter resulted in a $262.89 loss to the Government." *Id.* at 192. Accordingly, the Agency presented a bill for collection, requesting payment in the amount of $262.89, due within 30 calendar days of plaintiffs' receipt of the Determination Letter. *See id.* at 195 (Bill For Collection).

Plaintiffs lodged an appeal via letter of October 13, 2020, seeking "administrative review of the October 5, 2020 decision letter . . . .". *Id.* at 197 (the "Appeal"). Specifically, plaintiffs contested "the decisions made by Mr. Conn, . . . including but not necessarily limited to eligibility for a Civil Money Penalty . . . and the disposition of permanent disqualification from SNAP." *Id.* And, plaintiffs advised that "supporting information will be filed in writing at a later date . . . ." *Id.*

In response to the Appeal, Administrative Review Officer Ronald Gwinn of the FNS Administrative Review Branch issued a letter to plaintiffs' counsel, dated November 3, 2020. *Id.* at 200. Of import here, Gwinn invited plaintiffs' counsel to "submit additional information or evidence to support your request," due by November 24, 2020. *Id.*

By letter of January 29, 2021, Gwinn wrote to plaintiffs' counsel, advising of the Agency's decision to uphold its initial determination. *Id.* at 201 (the "Final Agency Decision" or "FAD"). The Agency noted that "no supporting information of any kind ha[d] been provided to [Gwinn] on this administrative review," notwithstanding that plaintiffs had represented that they

would provide "information to support an administrative review."  ECF 17-2 at 201.  The Agency concluded that, "in the absence of any information or contentions to support the request for review, no review can be conducted and this administrative review is now closed as 'moot.'" *Id.*

Plaintiffs received notice of the FDA via email on February 2, 2021.  *See* ECF 17-2 at 202.  This litigation followed.  ECF 4.

Additional facts are included in the Discussion.

## II. Standards of Review

### A.  Rule 12(b)(1)

Pursuant to Fed. R. Civ. P. 12(b)(1), the Government moves to dismiss, claiming lack of subject matter jurisdiction.  According to the Government, because the suit was untimely filed, the suit is barred by sovereign immunity.  ECF 15-1 at 23-25.

Federal district courts are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A., Inc. v. Jackson*, ___U.S.____, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 552 (2005).  Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted).  "Because jurisdictional limits define the very foundation of judicial

authority, subject matter jurisdiction must, when questioned, be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012).

The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___U.S.___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system").

Under Rule 12(b)(1), a plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014); *The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018).  In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion

must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).

In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction," *Kerns*, 585 F.3d at 192, "[u]nless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute.'" *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009), *cert. denied*, 558 U.S. 875 (2009). In a factual challenge, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In particular, "the district court may . . . resolve the jurisdictional facts in dispute by considering evidence . . . such as affidavits." *Vuyyuru*, 555 F.3d at 348. When appropriate, the court may also "hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations." *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999); *see also Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 644 (4th Cir. 2018); *Kerns*, 585 F.3d at 192.

In this case, the challenge is a factual one, as the parties dispute the circumstances surrounding the filing of this suit. *See* ECF 15-1 at 18-20, 23-25-; ECF 20-1 at 4-5; ECF 25 at 3-11. Therefore, I may consider the relevant exhibits in resolving the parties' dispute.

### B.  Rule 12(d) and Rule 56

The Motion is styled as a "Motion To Dismiss Or, In The Alternative, For Summary Judgment." ECF 15-1 at 4. A motion styled in the alternative implicates the court's discretion

under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[9]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*. In general, courts are guided by whether consideration of extraneous material "is

---

[9] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a

genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiffs have not filed a Rule 56(d) affidavit. Nor does the Opposition contain a request for discovery. Indeed, the Opposition does not identify any material that might be sought via discovery. Further, the Government has submitted the Record, which plaintiffs do not challenge.

To the extent that the Court considers the merits, it is appropriate to construe the Motion as one for summary judgment, rather than as a motion to dismiss.  This approach aligns with numerous cases in this District and elsewhere regarding review of SNAP retailer violations, and would facilitate resolution of the case.  *See, e.g.*, *Brother Convenience Store, Inc. v. U.S. Dep't of Agric.*, GLR-20-1346, 2021 WL 3911594, at *8 (D. Md. Sept. 1, 2021);  *Green Apple Grocery and Deli v. United States Dep't of Agriculture*, RDB-19-1408, 2021 WL 533730, at *6 (D. Md. Feb. 12, 2021); *Negash v. United States*, RDB-17-1954, 2018 WL 722481, at *4 (D. Md. Feb. 5, 2018), *aff'd*, 772 F. App'x 34, 35-36 (4th Cir. 2019) (per curiam); 7-*Eleven, Inc. v. United States*, GLR-15-543, 2016 WL 5107129, at *2 (D. Md. Jan. 29, 2016) *Mahmood v. United States*, WMN-12-0228, 2012 WL 3038638, at *2 (D. Md. July 24, 2012); *AJS Petroleum*, 2012 WL 683538, at *5.

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp*., 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co*., 475 U.S. at 587; accord *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc*., 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted). Rather, "there must be evidence on which the jury could reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty*., 893 F.3d

213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc*., 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 Fed. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, ___ F. 4th ___, 2022 WL 2901043, at *9 (4th Cir. July 22, 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see also, e.g.*, *Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co*., 499 Fed. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in

at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

### C.  Judicial Review of the Agency Decision

Under 7 U.S.C. § 2023(a)(13), a SNAP authorized retailer may obtain judicial review of the Agency's decision to disqualify the retailer.  To do so, the retailer must file suit in "any court of record of the State having competent jurisdiction, within thirty days after the date of delivery or service of the final notice of determination upon it, requesting the court to set aside such determination."  *Id.*

Judicial review of an administrative disqualification involves a two-part inquiry.  First, the district court "shall [conduct] a trial de novo" to "determine the validity" of the FNS's finding that the retailer violated SNAP regulations.  *Id.* § 2023(a)(15).  In the context of SNAP, de novo review means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur.  *AJS Petroleum*, 2012 WL 683538, at *4.  To carry this burden, a plaintiff "may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir. 1975).  Thus, in reviewing the agency decision, "the court is not bound by the administrative record . . . ."  *Green Apple Grocery and Deli*, 2021 WL 533730, at *5; *see AJS Petroleum*, 2012 WL 683538, at *4 ("In seeking to disprove the violations, [the retailer] is not limited to the factual record before the agency, but may rely on other evidence as well.") (citing *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997)); *see also Negash*, 2018 WL 722481, at *3; *Mahmood*, 2012 WL 3038638, at *2.

Second, courts apply the "arbitrary and capricious" standard to assess the validity of the sanction.  *Betefsa, Inc. v. United States*, 410 F. Supp. 3d 132, 138 (D.D.C. 2019) ("Although the

validity of the underlying violation is reviewed by trial de novo, 'judicial review of the agency's choice of penalty is focused on whether the [FNS] abused [its] discretion.'"); *see Cross v. United States*, 512 F.2d 1212, 1215 (4th Cir. 1975) (noting that the scope of judicial review extends to the administrative sanction); *see, e.g., Negash*, 2018 WL 722481, at *3; *Mahmood,* 2012 WL 3038638, at *2; *AJS Petroleum*, 2012 WL 683538, at *4; *2341 E. Fayette St., Inc. v. United States*, JFM-05-974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005) (citing *Willy's Grocery v. United States*, 656 F.2d 24, 26 (2nd Cir. 1981)); *see also Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993); *Bruno's, Inc. v. United States*, 624 F.2d 592, 594 (5th Cir. 1980).

"The arbitrary and capricious standard asks 'whether the determination is unwarranted in law or without justification in fact.'" *Mahmood,* 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F. Supp. 2d at 393); *see Affum v. United States*, 566 F.3d 1150, 1161 (D.C. Cir. 2009) ("Under the applicable standard of review, the Secretary abuses his discretion in his choice of a penalty if his decision is either 'unwarranted in law' or 'without justification in fact . . . .'") (internal citation omitted). "The plaintiff has the burden of proof on the sanction issue as well." *Shreegi Enterprises, Inc. v. United States*, 1:CV-15-2232, 2018 WL 1919576, at *2 (M.D. Pa. Apr. 24, 2018).

"[O]nly in those instances in which it may be fairly said on the de novo record as a whole that the Secretary, acting through his designates, has abused his discretion by acting arbitrarily or capriciously, would the district court be warranted in exercising its authority to modify the penalty." *Cross*, 512 F.2d at 1218. "[T]he views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Id*. "A complaining party is still entitled to a trial *de novo* to create a factual record on the Secretary's determination not to a impose a civil money penalty in lieu of disqualification, and judicial

review of the Secretary's choice of penalty is based on that *de novo* record. But the controlling standard of review is abuse of discretion." *Affum*, 566 F.3d at 1161 (emphases in original).

"Thus, in a case such as this, the District Court obviously must consider, *inter alia*, whether the Secretary reasonably weighed the statutory factors listed in § 2021(b)(3)(B), (B)(i), (B)(ii)(I), and (B)(ii)(II) and reasonably applied any lawful regulations adopted pursuant to § 2013(c) and § 2021(a)(2) . . . in denying [plaintiff's] request for a civil money penalty in lieu of disqualification." *Id*. at 1161-62. "Even in those instances in which a district court may find on de novo review that the Secretary erred in his determination of the fact and gravity of the violations, it would be incumbent on the district court to prescribe an alternate penalty, not on the basis of what it, in the exercise of its judgment, would consider reasonable and just, but within the guidelines set by the Secretary for the enforcement of the Act." *Cross*, 512 F.2d at 1218-19. The trial de novo provision of 7 U.S.C. § 2023(a)(13) does not, however, entitle plaintiffs to a trial on the merits as to their cause of action. *Mahmood*, 2012 WL 3038638, at *2.

Indeed, as mentioned, numerous courts have noted that "'summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact.'" *Id*. (quoting *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 599 (E.D. Va. 2000)); *see also Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8; *J&K Deli, Inc. v. United States*, JMC-19-3282, 2021 WL 1102344, at *5 (D. Md. Mar. 22, 2021) (Coulson, M.J.); *7-Eleven, Inc.*, 2016 WL 5107129, at *1-4. Furthermore, "'[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment.'" *Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8 (quoting *Duchimaza v. United States*, 211 F. Supp. 3d 421, 439 (D. Conn. 2016)) (alteration in *Brother Convenience Store, Inc.*).

### III. Discussion

The Motion lodges two challenges to the Complaint.  First, the Government asserts that the Court lacks jurisdiction to hear this suit because plaintiffs failed to file the Complaint within the thirty-day window provided for by statute.  ECF 15-1 at 23-25.  Second, the Government posits that even if the Complaint had been timely filed, it fails on the merits.  *Id.* at 25-30.

I shall consider each contention, in turn.

### A.  Timeliness

As noted, the Government contends that the suit was untimely filed and thus it is barred by sovereign immunity.  ECF 15-1 at 23-25; ECF 25 at 7-10.  The Government also asserts that there is no ground on which to toll the relevant deadline.  ECF 25 at 3-7, 10-11.  Plaintiffs maintain that they delivered the suit to the Clerk on March 4, 2021, but the Clerk did not process it at that time.  *See* ECF 20-1 at 3-4.  Therefore, they claim that the deadline is subject to "tolling."  *Id.* at 5.

### 1.

As mentioned, under 7 U.S.C. § 2023(a)(13), a SNAP participant, such as the Store, may seek judicial review of an Agency decision "by filing a complaint against the United States . . . within thirty days after the date of delivery or service of the final notice of determination upon it, requesting the court to set aside such determination."  In this case, the FDA was issued on January 29, 2021 (ECF 17-2 at 201) and it was delivered to plaintiffs on February 2, 2021.  *Id.* at 202.  Therefore, in accordance with 7 U.S.C. § 2023(a)(13), plaintiffs were required to file suit by March 4, 2021.  As the Government points out (ECF 15-1 at 24-25; ECF 25 at 4-6), the Complaint is date-stamped March 8, 2021, *i.e.*, four days after the deadline.  *See* ECF 4 at 1.

As an initial matter, controlling Fourth Circuit precedent would seem to foreclose plaintiffs' argument. *See* ECF 25 at 7, 9. Specifically, in *Shoulders v. U.S. Dep't of Agric.*, 878 F.2d 141, 143 (4th Cir. 1989), the Fourth Circuit determined that 7 U.S.C. § 2023 provided a conditional waiver of the federal government's sovereign immunity, so long as suit was filed within the time frame prescribed by the statute.

In that case, the proprietor of Shoulders Market ("Shoulders"), a Virginia convenience store, brought suit in a Virginia court under 7 U.S.C. § 2023(a)(13), seeking to "stay an administrative order disqualifying Shoulders from participation in the federal food stamp program . . . ." *Id.* at 142. Thereafter, the Government removed the case to federal court and subsequently moved to dismiss. *Id.* at 143.

Notably, the Government argued that the suit was subject to dismissal, as the plaintiff had conceded that it was not filed within the time period set forth in 7 U.S.C. § 2023(a)(13). *Id.* at 143. In response, the plaintiff argued that "her suit was timely under a Virginia statute that grants a continuance of right to state court litigants whose attorneys are, among other things, members of the Virginia General Assembly." *Id.* (footnote omitted). The district court agreed with the Government and dismissed the plaintiff's action as untimely. *Id.*

On appeal, the Fourth Circuit affirmed. *Id.* In relevant part, the Fourth Circuit determined that 7 U.S.C. § 2023(a)(13) constitutes a "conditional waiver of the United States' sovereign immunity, the condition being that aggrieved parties must commence suit within thirty days of notice of adverse FNS action." *Id.* Citing *Block v. North Dakota*, 461 U.S. 273, 287 (1983), the *Shoulders* Court instructed that "courts must strictly construe and enforce such conditions in favor of the United States." *Shoulders*, 878 F.2d at 143. As a result, the Fourth Circuit concluded that the provision "does not allow extensions of time." *Id.* Further, the Fourth

Circuit explained that,  to the extent that Virginia law permitted a longer limitations period to file suit, the limitations period set forth in § 2023(a)(13) "must prevail, under the Supremacy Clause . . . ."  *Id.* (citing *Felder v. Casey*, 487 U.S. 131, 138 (1988); *Free v. Bland*, 369 U.S. 663, 666 (1962)).

Judge Russell of this Court has said that *Shoulders* commands that where a suit is not "timely under § 2023(a)(13) . . . the Court lacks jurisdiction over it."  *Akpala v. U.S. Dep't of Agric.*, GLR-18-1175, 2019 WL 4127159, at *3 (D. Md. Aug. 29, 2019).    Under this principle, because the Complaint was not docketed until four days after the operative deadline, the Government would retain sovereign immunity, and thus the Court lacks jurisdiction to hear the case.

However, *Shoulders* predates several significant Supreme Court cases.  Since *Shoulders* was decided, the Supreme Court has clarified that there exists meaningful differences between jurisdictional requirements and mere claims-processing provisions.  *See*, *e.g.*, *Fort Bend Cty., Texas v. Davis*, ___U.S.___, 139 S. Ct. 1843 (2019) (finding nonjurisdictional the administrative requirements set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*); *United States v. Wong*, 575 U.S. 402, 412 (2015) (determining that the limitations period set forth in the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, is not jurisdictional and thus is subject to equitable tolling); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157, 163-64 (2010) (explaining that although the Copyright Act, 17 U.S.C. § 101 *et seq.*, mandates parties to register their copyrights before commencing an infringement action in federal court, this requirement is a claim-processing rule, not a jurisdictional prerequisite to suit); *Young v. United States*, 535 U.S. 43, 47 (2002) (holding that the limitations period established in the 11 U.S.C. § 507(a)(8)(A)(i) is subject to equitable tolling).  Further, the Supreme Court has emphasized the "'general rule'

that equitable tolling is available in suits against the Government.'"  *Wong*, 575 U.S. at 412

(quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990)).

Other district courts outside of the Fourth Circuit have construed the statutory time

provision in 7 U.S.C. § 2023(a)(13) in light of the Supreme Court's guidance, and have

determined that this provision is a "'quintessential claim-processing rule[ ]'" that does "'not

deprive a court of authority to hear a case.'"  *Joseph v. United States*, 505 F. Supp. 3d 977, 980

(N.D. Cal. 2020) (quoting *Wong*, 575 U.S. at 410) (alterations added); *see also Singh v. United

States*, 20-cv-1640-DMS-BLM, 2021 WL 37724, at *2 (S.D. Cal. Jan. 4, 2021) (explaining that,

in light of *Wong*, 575 U.S. 412, "[p]laintiffs' failure to comply with § 2023(a)(13)'s deadline

does not automatically bar their action"); *accord Southard v. Wicomico Cty. Bd. of Educ.*, 79 F.

Supp. 3d 552, 556 (D. Md. 2015) (noting that "the Supreme Court has clarified the difference

between jurisdictional requirements and mere claims processing provisions," which led "at least

one court to revise its prior conclusion that the IDEA conditioned federal jurisdiction on a

litigant's exhaustion of administrative remedies") (citing *Payne v. Peninsula Sch. Dist.*, 653 F.3d

863, 870-71 (9th Cir. 2011) (en banc)).

In particular, the *Joseph* Court explained, 505 F. Supp. 3d at 980-81:

> [T]he government has to "clear a high bar" to show that Congress intended the
> 30-day deadline in Section 2023(a)(13) to be a jurisdictional limitations period.
> [*Wong*, 575 U.S.] at 410.  It has not succeeded.  Nothing in the plain language of
> the statute manifests a jurisdictional intention.    To the contrary, Section
> 2023(a)(13) "'reads like an ordinary, run-of-the-mill statute of limitations,'
> spelling out a litigant's filing obligations without restricting a court's authority."
> *Wong*, 575 U.S. at 411 (quoting *Holland v. Florida*, 560 U.S. 631, 647 (2010))
> . . . .
>
> The next question is whether Section 2023(a)(13) manifests a "clear intent
> to preclude tolling," or "leaves room" for flexibility.  *Nutraceutical Corp. v.
> Lambert*,      U.S.      , 139 S. Ct. 710, 714 (2019); *see also Young v. United
> States*, 535 U.S. 43, 49 (2002) (statutory deadline is subject to equitable tolling
> unless   inconsistent   with   text).      Non-jurisdictional   limitations   periods   are

"normally subject to a 'rebuttable presumption' in *favor* 'of equitable tolling,'" *Holland*, 560 U.S. at 645-46 (2010) (emphasis in original) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990)), and the "simple fact that a deadline is phrased in an unqualified manner does not necessarily establish that tolling is unavailable," *Nutraceutical*, 139 S. Ct. at 715.

Nothing in Section 2023(a) precludes tolling. The plain language certainly does not say that. *See Holland*, 560 U.S. at 647 (lack of "unusually emphatic" language suggests equitable tolling is available). In addition, the 30-day period for seeking judicial review is "not particularly long," and is not part of a detailed scheme providing different deadlines for bringing different kinds of claims, which are among other factors the Supreme Court has considered in determining whether a statutory deadline may be equitably tolled. *Id.* at 646-47.

To be sure, *Shoulders*, 878 F.2d 141, is a published opinion of the Fourth Circuit and, to the best of my knowledge, it has not been overruled. Thus, I am bound to abide by it. *See United States ex rel. Palmieri v. Alpharma, Inc.,* 928 F. Supp. 2d 840, 857 (D. Md. 2013) ("In sum, [*United States ex rel Nathan v. Takeda Pharms. N. Am., Inc.* 707 F.3d 451 (4th Cir. 2013)] is binding circuit precedent that is clearly dispositive of the issue. It dictates that the Amended Complaint must be dismissed for failure to state a claim upon which relief can be granted."), *rev'd on other grounds*, 647 F. App'x 166 (4th Cir. 2016). However, given the age of the case, and more recent Supreme Court decisions, it may no longer control.

In any event, I need not resolve that issue. This is because, even if the filing deadline set forth in the statute is subject to equitable tolling, the defense is unavailable to these plaintiffs. I explain.

## 2.

Equitable tolling is a rare remedy that "allow[s] for exceptions to the strict enforcement of deadlines" and "restore[s] a claimant's right to review even though she otherwise would be time-barred." *Gayle v. United Parcel Serv., Inc*., 401 F.3d 222, 226 (4th Cir. 2005). A litigant is entitled to equitable tolling if: (1) he "'pursu[ed] his rights diligently,'" and (2) "'some

extraordinary circumstance stood in his way and prevented timely filing.'" *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (*quoting Holland v. Florida*, 560 U.S. 631, 649 (2010)); *see Edmonson v. Eagle National Bank*, 922 F.3d 535, 548 (4th Cir. 2019); *Battle v. Ledford*, 912 F.3d 708, 718 (4th Cir. 2019).

But, as the Fourth Circuit has stated, equitable tolling is available only in "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (*quoting Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)); *see Irwin*, 498 U.S. at 96 (noting that the doctrine of equitable tolling is to be applied "sparingly"); *Hutchinson*, 209 F.3d at 330 (noting that equitable tolling "must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes").

Courts in this Circuit generally apply equitable tolling in a narrow set of situations, including: (1) "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," *Gayle*, 401 F.3d at 226 (internal quotation marks omitted); (2) "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the limitations period," *id.* (internal quotation marks omitted); or (3) where "extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time." *Hutchinson*, 209 F.3d at 330. "In contrast, equitable tolling is not appropriate in cases where 'the claimant failed to exercise due diligence in preserving his legal rights.'" *Angles*, 494 F. App'x at 332 (quoting *Irwin*, 498 U.S. at 96).

In the Fourth Circuit, the "settled general rule" is that "the burden of proving an affirmative defense is on the party asserting it." *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir.

2007).  Thus, a "plaintiff bears the burden of establishing the timeliness of the filing of her complaint whe[n] it is contested by the defendant." *Cepada v. Board of Education of Baltimore County*, WDQ-10-0537, 2010 WL 3824221, at *3 (D. Md. Kinfolk. 27, 2010); *see also Darden v. Cardinal Travel Center*, 493 F. Supp. 2d 773, 776 (W.D. Va. 2007).

In this case, plaintiffs assert that tolling should apply because the Complaint was submitted timely but then untimely docketed, for reasons outside of their control.  Specifically, plaintiffs maintain that "the Complaint was presented to the Circuit Court for Baltimore City on March 4, 2021," but the "Civil Clerk's office . . . was closed to the public" on that date.  ECF 20-1 at 4.  As a result, they contend that "a drop box was the sole means for filing papers with that Court."  *Id.*  Plaintiffs seem to assert that the suit was placed in the drop box on March 4, 2021, but, based on what they concede is "speculation and conjecture," items deposited in the "drop box were not stamped as received by the court on Thursday, March 4, 2021, nor Friday, March 5, 2021, nor Saturday March 6, 2021 nor Sunday March 7, 2021 . . . ."  *Id.*

Further, plaintiffs posit, *id.* at 4-5: "As the pandemic was ongoing, staffing levels at the courthouses across the State of Maryland were reduced."  Thus, in plaintiffs' view, the "lag of time from depositing to docketing was likely attributable to the COVID-19 pandemic," which "warrant[s] tolling of the filing deadline in 7 U.S.C. § 2023(a)(13)."  *Id.* at 5.

To corroborate their claims, plaintiffs offer the Court the sworn Affidavit of Coriolanus A.J. Ferrusi, an attorney who works for plaintiffs' counsel at the firm of Freeman Rauch, LLC.  ECF 20-2 (the "Affidavit").  In the Affidavit, Mr. Ferrusi asserts that he "reviewed the internal records and internal computerized system for Freeman Rauch, for the file materials" pertaining to this suit.  *Id.* at 1, ⁋ 2.

Based on Mr. Ferrusi's review, he avers that on March 4, 2021, the "Complaint for Judicial Review (Dkt. 1-5) was hand delivered to the Circuit Court for Baltimore City" by Patrick J.L. Dillon, Esquire, who represented plaintiff in earlier stages of this case. ECF 20-2 at 1, ⁋ 3; *see* ECF 4 at 7 (indicating that Mr. Dillon filed the Complaint on behalf of plaintiffs).[10] Specifically, Mr. Ferrusi maintains that "the letter, the Complaint for Judicial Review and a check for $185.00 were deposited by hand" by Mr. Dillon to the Circuit Court's drop box on March 4, 2021.  ECF 20-2 at 1, ¶ 3.

In support of these assertions, Mr. Ferrusi directs the Court's attention to a letter authored by Mr. Dillon, which is dated March 4, 2021.  ECF 20-2 at 3 (the "Dillon Letter").  It is on firm letterhead, and has a subject line that reflects the name of the instant suit.  *Id.*  Further, the Dillon Letter states, in relevant part, *id.*:

> Enclosed for filing in the above-referenced matter, please find the original and two (2) copies of the Complaint and related papers.  Also enclosed is this firm's check, number _____, in the amount of $185.00 to cover the filing fee in this matter.  Please date-stamp one of the copies and return in the self-addressed, stamped envelope.

The Dillon Letter does not reflect the manner of delivery to the Circuit Court for Baltimore City.  For example, there is no indication of "Hand Delivery."  And, the check number is not included, which suggests that this may not have been the final version of the letter.

Mr. Ferrusi also attests, ECF 20-2 at 2, ⁋ 4: "The clerk's office for the Circuit Court for Baltimore City, civil division, was closed to visitors on March 4, 2021 due to the ongoing COVID-19 pandemic."  He adds that "the clerk's office did not re-open for visitors until March 15, 2021."  *Id.*

---

[10] Mr. Dillon has not entered his appearance in this case in this Court.

Mr. Ferrusi has submitted a press release issued by the  Government Relations and Public Affairs Office of the Maryland Judiciary ("Public Affairs"), which is dated March 8, 2021.  *Id.* at 4-7 (the "2021 Press Release").  It states, *id.* at 4: "Beginning March 15, the clerks' offices in the circuit courts and District Court locations will be open to the public for all matters, though the number of people may be limited to achieve COVID-19 social distancing requirement."  It also states, ECF 20-2 at 7: "Individuals who have business with the courts should check the Judiciary's website . . . or call the clerk's office for information before arriving at a local courthouse location."

The Government points to an earlier press release, also issued by Public Affairs, that undermines plaintiffs' contentions.  ECF 25-1 (the "2020 Press Release").  It is dated December 22, 2020, approximately three months prior to the date on which plaintiffs' counsel purportedly attempted to file the Complaint with the Circuit Court for Baltimore City.  *Id.* at 1.  The 2020 Press Release provides, in part, *id.* at 2: "Clerks' offices in the District Court of Maryland and circuit courts throughout the state will remain open to the public for emergency purposes and by appointment for other matters."

Plaintiffs analogize the circumstances in this case to those in *Joseph*, 505 F. Supp. 3d at 979.  *See* ECF 20-1 at 4-5.   In *Joseph*, 505 F. Supp. 3d at 979, the plaintiffs received a notice of a final decision of the FNS, which permanently disqualified them from the SNAP program, on February 18, 2020.  However, they did not file a suit seeking judicial review of that decision until 36 days after the operative deadline had expired.  *Id.*  The plaintiffs argued that the district should excuse their delay "in light of the extraordinary circumstances caused by the COVID-19 pandemic and stay-at-home orders, which impeded their ability to find and retain an attorney to prepare the lawsuit."  *Id.* (internal quotation marks omitted).

The district court first found that § 2023(a)(13) was subject to equitable tolling, as discussed, *supra*. *Id.* at 980-81. The *Joseph* Court then found that the plaintiffs were "entitled to tolling." *Id.* at 981. It explained, *id.*: "It should go without saying that the current public health crisis and resulting restrictions on civil and personal life are extraordinary circumstances by any measure. That was all the more true in the early part of 2020 when the pandemic initially struck, and when plaintiffs' time to file a lawsuit was running." Further, the district court determined that plaintiffs had "exercised reasonable diligence in looking to hire a lawyer, and the delay in filing the complaint was of minimal duration." *Id.*

In contrast, plaintiffs' deadline to file the Complaint expired on March 4, 2021, approximately one year into the COVID-19 pandemic. Certainly, the pandemic has continued to impact the day-to-day machinations of public life. But, plaintiffs can hardly say that they were subjected to restrictions of the kind that were imposed on the *Joseph* plaintiffs in March 2020, at the very outset of the pandemic. *See Joseph*, 505 F. Supp. 3d at 979. Indeed, plaintiffs have not presented any evidence to that effect. To the contrary, the evidence before the Court suggests that the clerks' offices of the Maryland courts were open on March 4, 2021, at least by appointment. *See* ECF 25-1.

In my view, the evidence does not warrant tolling the relevant deadline in this case, even assuming the Court has the authority to do so. Notably, other filings in this suit directly contradict plaintiffs' assertion that the suit was "presented" to the Circuit Court for Baltimore City on March 4, 2021. ECF 20-1 at 4. Specifically, while the suit was still pending in the Circuit Court for Baltimore City, plaintiffs filed an "Affidavit of Service" authored by Mr.

Dillon.  *See* ECF 1-10 at 7-8.[11]   Under the penalty of perjury, Mr. Dillon stated, *id.* at 7, ⁋ 3: "On or about March 8, 2021, my office filed the Complaint for Judicial Review in the above-captioned matter."

Moreover, there is no evidence to suggest that the Clerk's Office for the Circuit Court for Baltimore City was inaccessible to plaintiffs' counsel on March 4, 2021.  Indeed, far and away from establishing that the Circuit Court was closed to the public until March 15, 2021, the 2021 Press Release expressly provides for the manner in which parties "who have business with the courts" should communicate with the relevant court, to wit "call[ing] the clerk's office for information before arriving at a local courthouse location."  ECF 20-2 at 6.

Further, to the extent that the operations of the Circuit Court for Baltimore City were curtailed, this was not a surprise.  Thus, it is puzzling that plaintiffs' counsel waited to file the suit until March 4, 2021, the operative deadline to do so.  *See Kellum v. Comm'r of Social Security*, 295 F. App'x 47, 50 (6th Cir. 2008) (rejecting the application of equitable tolling when plaintiff's failure to timely file was due, in part, to "his decision to wait until the last possible day to file his complaint," and describing the case as "yet another 'classic reminder of the risks that applicants take for no apparent reason by waiting until the very end of a filing period to initiate their lawsuits") (internal citation omitted).  Indeed, the delay is all the more striking because, in contrast to *Joseph*, plaintiffs' counsel had represented plaintiff in the earlier stages of their dispute with FNS.  *See* ECF 17-2 at 197-98.

---

[11] Remarkably, neither party directed the Court's attention to this Affidavit.  However, in accordance with Fed. R. Evid. 201, the Court may "properly take judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see also Schultz v. Braga*, 290 F. Supp. 2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice  of dockets in state proceedings).

In sum, plaintiffs did not submit the Complaint in a timely manner.  But, even assuming that plaintiffs' failure to do so does not divest this Court of subject matter jurisdiction, plaintiffs have not presented any ground to toll the relevant deadline.  Simply put, plaintiffs have not established that their failure to file the Complaint within the time specified by the statute is attributable to the inaccessibility of the Clerk's Office for the Circuit Court for Baltimore City in March 2021.  Thus, plaintiffs' suit is subject to dismissal.

Assuming, *arguendo*, that this Court has jurisdiction, I turn to review the arguments pertaining to the merits of plaintiffs' suit.

### B.  Trafficking Violation

The district court must first "determine the validity" of the FNS's finding that the retailer violated SNAP regulations.  7 U.S.C. § 2023(a)(15).  In the context of SNAP, the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur.  *AJS Petroleum*, 2012 WL 683538, at *4.  The Government, as the moving party, may show it is entitled to summary judgment by relying on evidence in the Record or an absence of evidence to support plaintiffs' case.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 325.  Although the Court may go beyond the administrative record on de novo review, plaintiffs have not supplemented the Record with respect to the merits.

The Motion asserts that "[p]laintiffs simply cannot meet their burden of proof that trafficking did not occur in this case," as "there were two separate instances of trafficking, and an unconsummated request by the Owner to continue the illicit activity into the future, all occurring on a single day."  ECF 15-1 at 27.  Notably, plaintiffs failed to advance any argument to the contrary in the Opposition.  And, plaintiffs who fail to respond to an argument for dismissal are deemed to have abandoned the claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F.

44

Supp. 2d 772, 783 (D. Md. 2010).  Therefore, to the extent that the Complaint lodges a challenge to the Agency's determination that a trafficking violation occurred, plaintiffs have abandoned the claim.

In any event, the undisputed facts make clear that plaintiffs could not have met their burden to show that no trafficking violation occurred.  As earlier indicated, "[t]rafficking" is defined in pertinent part as "buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards . . . for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."  7 C.F.R. § 271.2.  And, it is undisputed that Asghar, the owner of the Store, did precisely that on June 19, 2020, by exchanging SNAP benefits for $80 in cash.  *See* ECF 17-2 at 96-99.  Indeed, in the Response, plaintiffs' counsel advised that Asghar admitted to "request[ing] the Red Bull and did so in violation of SNAP regulations."  *Id.* at 132.

Thus, the Government is entitled to summary judgment with respect to the issue of a violation of the SNAP regulations by plaintiffs.

## C.  Penalty

Having determined that the FNS did not err in finding that a trafficking violation occurred, the Court must next consider whether the sanction of permanent disqualification imposed by FNS is appropriate.  As set forth above, review is premised on the arbitrary and capricious standard.  And, "[w]hether the imposition of a penalty by the FNS [is] arbitrary and capricious is a matter of law appropriately determined on a motion for summary judgment." *Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8 (quoting *Duchimaza*, 211 F. Supp. 3d at 439) (alteration in *Brother Convenience Store, Inc.*).

"The arbitrary and capricious standard asks 'whether the determination is unwarranted in law or without justification in fact.'"  *Mahmood,* 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F. Supp. 2d at 393).  "[T]he views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight."   *Cross*, 512 F.2d at 1218. According to the Government, plaintiffs' evidence does not come within hailing distance of establishing that the Agency abused its discretion in declining to grant a trafficking CMP in lieu of permanent disqualification.  ECF 15-1 at 28-30.

Plaintiffs counter that "there is no evidence in said record that the FNS considered the mitigating information and facts offered by Plaintiffs' for consideration of a CMP."  ECF 20-1 at 6.  In particular, plaintiffs argue that FNS erred because it "failed to weigh the extent of the trafficking violations, coupled with Plaintiffs long history of compliance in contravention with 7 CFR §§ 278.6(i)(1)(iv) and (v)."  ECF 20-1 at 8.  Thus, plaintiffs assert that "the disqualification was 'unduly harsh.'"  *Id.* (quoting *7-Eleven #22360 v. United States*, 560 F. Supp. 3d 892, 916 (D. Md. 2021)).

Further, plaintiffs complain that when they "requested consideration of a different amount for a CMP than the FNS's calculation of $38,340.00," it was to no avail.  ECF 20-1 at 6. And, plaintiffs claim that "the administrative record is absent any findings that the disqualification will not cause undue hardship to SNAP households."  *Id.* at 7.

To review, permanent disqualification is the default penalty for a trafficking violation, unless the Agency determines the retailer had in place an effective anti-trafficking policy, in which case it may impose a CMP.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697.  Moreover, to qualify for a CMP, the retailer must

submit "substantial evidence" showing that the retailer meets multiple criteria. *See Idias*, 359 F.3d at 697.

As noted, the criteria are as follows, 7 C.F.R. § 278.6(i):

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations . . . .

As discussed earlier, 7 C.F.R. § 278.6(i) provides additional detail as to the criteria. And, "[a]ll four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP]." *Castillo*, 989 F. Supp. at 418; *see also, e.g.*, *Traficanti v. United States*, 227 F.3d 170, 174 (4th Cir. 2000) ("The Agriculture Department promulgated four criteria to determine whether a store qualifies for the fine."); *7-Eleven, Inc.*, 2016 WL 5107129, at *3-4 (noting that "[t]he CMP criteria require a firm to provide substantial evidence that establishes its fulfillment of *each* of the [criteria]," and upholding permanent disqualification even when plaintiff "provided evidence . . . that firm ownership was not aware and did not approve of the trafficking violations.").

As the regulations reflect, there is an expectation of written and contemporaneous documentation to establish substantial evidence. "SNAP regulations require that, in the absence of documentary evidence showing certain facts, the FNS must permanently disqualify a firm that has trafficked in SNAP benefits . . . . To avoid disqualification, a firm must submit documentary

evidence establishing the criteria set forth in 7 C.F.R. § 278.6(i)." *Muazeb v. United States*, No. 17-cv-6754, 2019 WL 1613433, at *11 (S.D.N.Y. Mar. 28, 2019).

The Fourth Circuit's holding in *Traficanti*, 227 F.3d 170, is informative.  There, the retailer "had the opportunity to present evidence that he conducted an effective training program to combat food stamp fraud." *Id.* at 175.  But, "[h]e submitted no documentation to show that he met the four criteria mandated by the regulations."  *Id.*  The Court said: "Store owners cannot simply attest to having effective antifraud programs; rather, they must prove it."  *Id.*  In its view, "Traficanti fell well short of meeting the standards of the statute or the regulations.  The FNS decision not to convert the permanent disqualification into a fine was mandated by statute." *Id.*

Likewise, in a case similar to this one, Judge Russell granted the defendant's motion for summary judgment, upholding the penalty of permanent disqualification.  *7-Eleven, Inc.*, 2016 WL 5107129, at *2 n.1, 4.  Judge Russell noted that the plaintiff retailer had provided evidence of a compliance policy, that ownership was not aware of the violation, and that it was the retailer's first violation.  *Id*. at *3.  But, the plaintiff had not established that it had instituted an effective personnel training program, and in fact documentation reflected that its employees had not completed SNAP training.  *Id.*

Other cases around the country are to like effect.  *See*, *e.g.*, *Nova Grocery, Inc. v. United States*, 20-CV-2150 (KAM) (MMH), 2022 WL 2657119, at *8 (E.D.N.Y. July 8, 2022); *Al Ghadeer Meat Mkt. Inc. v. United States Dep't of Agric., Food & Nutrition Serv.,* No. 2:19-CV-12131, 2022 WL 805864, at *6 (E.D. Mich. Mar. 15, 2022); *Nakhle v. United States*, No. 1:19 CV 01470, 2020 WL 6826367, at *9 (N.D. Ohio Nov. 20, 2020); *Rosario v. United States*, No. 3:14-CV-00907, 2017 WL 4316093, at *4 (D. Conn. Sept. 27, 2017); *Kashif v. United States*, No. 14-cv-30180, 2016 WL 3886164, at *7-8 (D. Mass. May 12, 2016).

In my view, plaintiffs have engaged in a blinkered reading of the Agency's decision.  The FNS expressly considered the arguments presented by the Response; it found that they were not sufficient to warrant imposing a CMP in lieu of disqualifying the Store.  *See* ECF 17-2 at 189-191.  More to the point, however, the Agency did not err in disqualifying the Store from the SNAP program.  Indeed, even putting aside the fact that the owner of the Store, rather than a Store employee, committed a trafficking violation, the Record is devoid of any evidence showing that the Store had developed antifraud policies and that it had trained its employees with respect to that policy.  These failures alone required the Agency to disqualify the Store.

To be sure, plaintiffs assert that they had "submitted proof of a program that contained the Retailer Training Materials . . . and Plaintiffs had no prior record of violations with FNS . . . ." ECF 20-1 at 8.[12]  Indeed, the Response stated that the Store "had an effective compliance policy . . . based on Respondents' knowledge of the SNAP program and information they received from the FNS when they first entered the program." ECF 17-2 at 133; *see id.* at 136-88 (SNAP Training Manual).  Further, the Response provided that the Store's employees "were trained by Mr. Asghar personally based on his experience and in accordance with the SNAP training guide." *Id.* at 133.[13]

But, the Training Materials appear to be no more than the materials that FNS provided to plaintiffs when the Store was approved to participate in the SNAP program. *See id.* at 136-88.  Plaintiffs have adduced no evidence showing that they developed antifraud policies, in compliance with the regulations earlier described.  For instance, the Training Materials do not

---

[12] In support of this assertion, plaintiffs cite to "administrative record Asghar 001-053." ECF 20-1 at 8.  The citation appears to pertain to ECF 17-2 at 136-88.

[13] Indeed, it is apparent that on June 16, 2020, the Store clerk, Zain Tariq, complied with the SNAP rules, which leads to the inference that the clerk was versed in the rules.

include any "[d]ocumentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating FSP regulations" or "[d]ocumentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of FSP violations or irregularities committed by firm personnel." 7 C.F.R. § 278.6(i)(1).

Nor does the Record contain any evidence showing how or when plaintiffs trained the Store's employees. Indeed, plaintiffs have not provided any evidence showing that Store employees were trained on the details of the Store's antifraud policies. However, the requirement is not satisfied merely because the clerk complied with the Program rules on June 16, 2020.

As set forth above, federal regulations require that where a firm seeks a CMP as opposed to a permanent disqualification, it must provide documentation pertaining to its policies and training activities. *See Traficanti*, 227 F.3d at 175. Among other things, this information must include "its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s)." Given these deficiencies, it is readily apparent that the Agency did not err in disqualifying plaintiffs from SNAP.

And, as the Government points out, the Agency was not required to address plaintiff's argument regarding the amount of the proposed CMP, "because Plaintiffs were not eligible to receive a CMP as a matter of law." ECF 25 at 6. Common sense provides that the Agency was not required to determine the appropriate amount of a CMP to which it had found plaintiffs were not entitled. *See also* ECF 17-2 at 113 ("*If it is determined* that [Plaintiffs] qualify for a CMP,

50

the amount of that penalty will be $38,340 . . . The amount of the CMP was calculated in accordance with SNAP regulations . . . .") (emphasis added).

Plaintiffs also contend that FNS erred because it failed to consider offering Mini Market a "hardship waiver." ECF 20-1 at 7. To be sure, SNAP regulations contemplate a "hardship waiver," pursuant to which "FNS may impose a civil money penalty as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to SNAP households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices." 7 C.F.R. § 278.6(f). However, such a CMP "may not be imposed in lieu of a permanent disqualification," which would be the case for a trafficking violation. *Id.* This is indicative of the seriousness with which Congress has approached such conduct. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

In any case, there is no factual material in the record reflecting that the hardship criteria are satisfied as to the Store. Nor have plaintiffs suggested that it might be able to produce such material.

In sum, I am persuaded that the Agency's decision to permanently disqualify the Store from SNAP, rather than impose a CMP, was not arbitrary and capricious. Thus, defendant is entitled to summary judgment as to the issue of the penalty.

## IV. Conclusion

For the foregoing reasons, I shall dismiss the suit under Rule 12(b)(1), for lack of subject matter jurisdiction. But, to the extent the Court has jurisdiction, I shall grant summary judgment in favor of the Government.

An Order follows, consistent with this Memorandum Opinion

Date:  August 18, 2022                                      _____/s/_____
                                                                      Ellen Lipton Hollander
                                                                      United States District Judge